IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

Vs.         Nos. 93-40037-02-SAC
             95-40050-01-SAC

KEVIN LEROY McLAUGHLIN,

    Defendant.

## MEMORANDUM AND ORDER

   The case comes before the court on the defendant Kevin McLauglin's motion to withdraw plea (Dk. 111) to which the government has filed its response in opposition (Dk. 113).  Counsel presented their arguments and evidence on February 8, 2004.  Having reviewed the matters submitted and researched the relevant law, the court is ready to rule.  The court also will make any necessary findings on the defendant's unresolved objections to the Presentence Report ("PSR") that appear in the PSR's addendum and will address the matters raised in the defendant's sentencing memorandum (Dk. 112) and the government's response thereto (Dk. 115).

## PROCEDURAL HISTORY

Kevin McLaughlin and Charles C. McKee were named in a 1993 indictment charging two drug trafficking counts. Count one charged the defendants with conspiracy to manufacture, distribute or dispense approximately 80 kilograms of amphetamine. Count two charged the defendants with maintaining a place for the purpose of manufacturing amphetamine. On October 17, 1994, the defendant Kevin McLaughlin pleaded guilty to count one in exchange for the government's agreement, *inter alia*, to dismiss count two, to not oppose a three-level reduction for acceptance of responsibility, to not advocate adjustments for role in the offense or obstruction of justice, and to not oppose the defendant remaining on bond pending sentencing.

During the change of plea hearing, the defendant under oath said that he was satisfied with services of his attorney and that he understood the terms of the plea agreement. (Dk. 110, pp. 4, 6). The government prepared a factual basis for the defendant's plea that was filed separately (Dk. 58) and also attached to the petition to enter a plea of guilty and the plea agreement (Dk. 60). Defense counsel agreed that the government would be able to introduce evidence from the witness stand proving the factual basis and count one. (Dk. 110, p. 11). The defendant then told the court that he had read the factual basis and that it was true. (Dk. 110,

p. 12).  The defendant answered the court that he knew of no reason, whether asked of him or not, why the court should not accept his guilty plea to count one. (Dk. 110, p. 15).  The defendant was informed that he would not be allowed to withdraw his plea if the court did not follow the plea agreement unless the court refused to dismiss count two.  (Dk. 110, pp. 6-7).  After conducting a thorough and full inquiry of the defendant's knowledge and understanding of the consequences from entering a plea of guilty, the court accepted the plea upon finding that the defendant was competent and capable of entering an informed plea, that his plea of guilty was entered "voluntarily, knowingly and understandingly and intelligently" and that an independent basis in fact supported each of the essential elements to count one.  (Dk. 110, pp. 15-16).

A presentence investigation report ("PSR") was prepared in 1994, and defense counsel[1] filed objections to the criminal history calculations.  This PSR recommended a guideline range of 188 to 235 months.  The defendant failed to appear at his sentencing hearing on January 13, 1995, and the court ordered the forfeiture of the bond and issued a bench warrant for the defendant's arrest.  In June of 1995, a single count indictment was filed in case no. 95-40050-01 charging

---

[1]The defendant was represented in this case by retained counsel from December 21, 1993, until June 30, 2004.

3

the defendant with failure to appear at sentencing.  The defendant remained a

fugitive until his arrest in Boscawen, New Hampshire, on June 17, 2004. The

defendant entered a plea of guilty to the failure to appear count in case no. 95-

40050-01 on August 3, 2004.

The PSR prepared in 2004 groups the two cases for sentencing and

treats the failure to appear count as a specific offense characteristic of obstruction

of justice in the guideline calculations for the drug trafficking count.  The PSR

recommends a base offense level of 36 in reliance on a Kansas Bureau of

Investigation report that the 12.5 gallons of benzaldehyde along with items

indicative of a manufacturing laboratory seized from the co-defendant's residence

would theoretically yield 79.87 kilograms of amphetamine.  The PSR finds this

amount of amphetamine to be the reasonably foreseeable production from the

laboratory found in the co-defendant's residence.  After the two-level adjustment

for obstruction of justice, the defendant's total offense level is 38.  Because his

criminal history qualifies the defendant as a career offender under U.S.S.G. §

4B1.1, the applicable criminal history category is VI.  Under the sentencing table,

the applicable guideline range for an offense level of 38 and a criminal history

category of VI is 360 months to life, but the defendant's guideline range under

U.S.S.G. § 5G1.1(b) is the 240-month statutory maximum under 21 U.S.C. §

841(b)(1)(C).

**FACTUAL BASIS OF PLEA**

The factual basis used at the defendant's change of plea hearing in

1994, filed in the court record, and admitted at the time as true by the defendant

states as follows:

On May 7, 1992, Special Agent (SA) Larry Dixon, Kansas Bureau
of Investigation (KBI), received information from Marshall County
Sheriff Kenneth Coggins that a confidential informant (CI) advised that
defendant McKee was operating a clandestine methamphetamine lab at 418
East 8th, Frankfort, Kansas. The CI reported that McKee, using the kitchen
stove, was making methamphetamine every three days. Electric records for
the address revealed high electric usage. Because the information was so
dated, a search warrant was not obtained at that time.

On September 3, 1992, Marshall County Undersheriff Arnold
Adkins also received information from a CI concerning a methamphetamine
lab at 418 East 8th, Frankfort. The CI advised that s/he had been in the
residence on August 31, 1992, and had personally seen the lab. That same
day, Adkins applied for and received a search warrant for 418 East 8th. The
search warrant was executed by SA Dixon and other KBI agents later that
same day.

The residence, which was vacant when entered, housed an
amphetamine lab. KBI chemist Jim Schieferecke, who was on the scene,
advised that amphetamine was being manufactured in the lab and that, based
on the chemicals that were found within the residence (red devil lye,
nitroethane, formamide, hydrochloric acid and an unlabeled container
smelling of Benzaldehyde), the Benzaldehyde method was being used to
manufacture the amphetamine. Tests run by Schieferecke revealed
amphetamine residue on glassware and other items that were found.
Schieferecke, who collected the lab evidence, identified other chemicals and
hardware commonly used in the manufacture of amphetamine.

While the search was taking place, SA Dixon was notified that McKee
had been located and taken into custody. At approximately 10:15 p.m.,

McKee waived his rights and was interviewed by SA Dixon and Undersheriff
Adkins. McKee originally denied knowledge of the drug producing activities
at his house, claiming that the officers probably knew more then he did. He
later changed his story, advising that Kevin McLaughlin had set up the lab a
year or so earlier. McKee said he only helped as he did not know how to
cook. McKee advised that they had cooked at least three batches of
amphetamine. He said the last time they had cooked was February 1992.
McKee admitted to buying Red Devil and other
brands of lye and delivering them to the lab. He also said that Doug Rogers,
whose father ran an auto supply store in Frankfort, delivered cans of auto
starting fluid (ether) to the lab location in exchange for some of the finished
product. The ether was used in the final stage of making the amphetamine.
During the course of the interview, McKee removed from his pants pocket a
hand-made pipe with marijuana residue and a bag of marijuana zig zag
papers.

McKee, who was booked into the Marshall County Jail on local
charges, was released on October 19, 1992.

Among the items seized from the premises as a result of the search
were baggies containing dried green vegetation/seeds, identification
documentation, a hand-held postage scale, four chemistry-related books, a
razor blade with brown residue, an RGBS ounce-to grain conversion scale, a
glass casserole dish with brown residue, a plastic bottle labeled "Inositol
Powder", five miscellaneous items of drug paraphernalia, a vinyl shaving kit
containing a Kansas driver's license belonging to Kevin McLaughlin, a white
plastic apron, various chemicals and approximately 12.5 gallons of
benzaldehyde (enough to theoretically produce 79.87 Kg. of amphetamine
given a sufficient amount of precursor chemicals and reagents).

Agents returned to the scene on September 4 to meet with APTUS
Environmental Services to evaluate hazardous material removal. On
September 9, 1992, APTUS chemical waste company personnel arrived and,
after approximately 3 ½ hours of cleanup, removed approximately nine
barrels of waste. The residence and garage were subsequently condemned
and destroyed on March 17, 1993.

On April 7, 1994, the United States Attorney's Office received a letter
from Paul A. Buhl, U.S. Probation Officer, advising that McKee violated his
bond in that Sandy Crouch had alleged to SA Dixon that McKee was
associating with George Thomas and they were routinely engaging in heavy

drinking. Crouch also said McKee had gone to her house and made veiled threats that "if there is a 'rat,' he will find out about it." When confronted by Buhl, McKee admitted to "routine contact with Sandy Crouch and brief contact with another witness, Dennis Rogers". McKee denied threatening Crouch. He was advised that any association with witnesses for this case could result in the revocation of his bond. As for the alcohol usage, McKee admitted to using alcohol while on bond, but claimed he had not done so since December 1993 or January 1994. He further advised that he and Thomas had been attending AA meetings in Marysville.

On June 1, 1994, following the Change of Plea hearing, SA Larry Dixon and Sheriff Kenneth Coggins interviewed and debriefed McKee. Marilyn Trubey, counsel for McKee, was also present during this meeting. During this interview, McKee provided the following information:

Kevin McLaughlin started the lab in early 1991. Doug Rogers procured some of the fittings, tubing, hose and other items necessary to the setup of the lab. McLaughlin did all the cooking while McKee served mainly as a "fetch and carry" person. McLaughlin showed McKee some of the process, but McKee never knew the quantity of chemicals involved in each batch.

McKee recalled that McLaughlin performed approximately four cooks with each cook producing from 1-3 pounds of finished product. (It should be noted that during McKee's first interview on September 3, 1992, McKee advised McLaughlin produced twelve ounces to a pound of amphetamine per cook.) McKee was provided two ounces of the finished product from each cook. McLaughlin did a cook approximately every six months. McKee believed the last cook took place in February 1992. At the time, McKee was under the impression that was the last cook McLaughlin intended to conduct at the 418 East 8th, Frankfort, address; however, he believed McLaughlin would come back for the chemicals, especially the Benzaldehyde.

McKee said he saw McLaughlin only one time following the February 1992 cook and the raid of his residence. McKee said McLaughlin came in just to take a shower. McKee believed it was during that visit that McLaughlin left his driver's license and shaving kit.

According to McKee, McLaughlin did not live at the residence. He did, however, spend several days during the cooks. When all was complete, he would leave with the finished product.

McKee said the only chemicals he procured for McLaughlin were the

7

Red Devil lye and the starting fluid (ether). Doug Rogers, who McKee thought was present during the first cook, also procured ether for some of the cooks. That was the extent of Rogers services, though, as McLaughlin believed he talked too much.

When asked by SA Dixon if McKee knew of others who were either involved in or knew of McLaughlin's business, McKee provided four names: 1) someone by the name of "Little Rick" from the Paxico area who McKee was able to describe but knew little else about; 2) George Thomas who was never involved in the lab but had knowledge of it; 3) Diane Elliott who knew about the lab and procured amphetamine from McKee but was never present during any of the cooks; and 4) Sandy Crouch, whose involvement was the same as Elliott's.

McKee said that following a cook, McLaughlin completely washed and dried the finished product. McLaughlin would then cut the amphetamine up to fifty per cent (50%) in weight volume, using a cutting agent such as Inositol. McLaughlin dried the product on mirrors in the upstairs area of the house. The solvents evaporated leaving the powdered end-product.

McKee said he recalled McLaughlin telling him that he received $32,000 for a kilo or approximately two pounds of finished product. McKee did not know what McLaughlin did with his money, but he knew that McLaughlin's wife had a 2-3 gram a day drug habit.

(Dk. 58).

## DEFENDANT'S ARGUMENTS FOR WITHDRAWING HIS PLEA

According to his written motion and the proffer of his counsel at the hearing, the defendant asserts that from the outset of this case he has maintained his innocence of the charges.  The defendant further claims in his motion that his involvement in manufacturing amphetamine occurred prior to the charged conspiracy and without any participation by the co-defendant.  The defendant describes in his motion a meeting he had with his retained counsel who estimated

the defendant's chance of success at trial to be "no better than fifty percent" and who informed the defendant of the need to pay additional fees for trial.  Defense counsel at the hearing proffered that the defendant had wanted to keep his retained counsel for trial but lacked sufficient funds to pay any additional fees.  The defendant contends his plea was not voluntary because these comments by his counsel pressured him into entering a plea.  The defendant submits he cooperated during the change of plea hearing in compliance with his attorney's directions.  The defendant wrote that in support of his motion he would testify at the hearing and offer the testimony of his then live-in girlfriend.  The defendant, however, offered nothing at the hearing other than his counsel's proffer.

The defendant further argues in his written motion that the prosecutor orally represented at the change of plea hearing that the conspiracy charged in count one "actually produced" 79.87 kilograms of amphetamine.  The defendant contends there was no evidence of such a quantity of amphetamine having been produced and that this allegation of 80 kilograms of amphetamine in the indictment came from the government's theoretical yield calculations based on the presence of benzaldehyde found at the co-defendant's residence.   The defendant insists the equities favor allowing his withdrawal of the plea because the theoretical yield calculations alleged in the indictment make his case unusual, greatly impact the

length of his sentence, and implicate the recent constitutional issues which the

Supreme Court identified in *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531

(2004), and resolved as to the federal sentencing guidelines in *United States v.*

*Booker*, 125 S. Ct. 738, 2005 WL 50108 (Jan. 12, 2005).

**RELEVANT LEGAL STANDARDS FOR PLEA WITHDRAWAL**

"A guilty plea is void if it is not knowing and voluntary." *United*

*States v. Gigley*, 213 F.3d 509, 516 (10th Cir. 2000) (citing *Parke v. Raley*, 506

U.S. 20, 28 (1992)).  The plea must "represent[] a voluntary and intelligent choice

among the alternative courses of action open to the defendant.'" *United States v.*

*Carr*, 80 F.3d 413, 416 (10th Cir. 1996) (quoting *Hill v. Lockhart*, 474 U.S. 52, 56,

106 S. Ct. 366, 369, 88 L. Ed. 2d 203 (1985)).  "This is because 'a guilty plea

constitutes a waiver of three constitutional rights:  the right to a jury trial, the right to

confront one's accusers, and the privilege against self-incrimination.'" *United*

*States v. Gray*, 152 F.3d 816, 820 (8th Cir. 1998) (quoting *Parke*, 506 U.S. at 29),

*cert. denied*, 525 U.S. 1169 (1999).

"There is no absolute right to withdraw a guilty plea." *United States*

*v. Rhodes*, 913 F.2d 839, 845 (10th Cir. 1990), *cert. denied*, 498 U.S. 1122 (1991);

*see United States v. Vidakovich*, 911 F.2d 435, 439 (10th Cir. 1990) ("[A]

defendant does not have any absolute right to withdraw his plea of guilty even

though the motion is made before sentencing"), *cert. denied*, 498 U.S. 1089 (1991).

Under Fed. R. Crim. P. 11(d), the district court may permit a defendant to

withdraw a plea of guilty after it has been accepted if "(A) the court rejects a plea

agreement under Rule 11(c)(5); or (B) the defendant can show a fair and just reason

for requesting the withdrawal."  A motion to withdraw a guilty plea is committed to

the district court's sound discretion "to determine what circumstances justify

granting" it.  *United States v. Jones*, 168 F.3d 1217, 1219 (10th Cir. 1999).  Even

so, "such motions should be 'freely allowed, viewed with favor, treated with

liberality, and given a great deal of latitude.'"  *Id*. (quoting *United States v. Carr*,

80 F.3d at 419).

   "'[C]oercion by the accused's counsel can render a plea

involuntary.'"  *Fields v. Gibson*, 277 F.3d 1203, 1213 (10th Cir.) (quoting *United

States v. Estrada*, 849 F.2d 1304, 1306 (10th Cir. 1988)), *cert. denied*,  537 U.S.

1023 (2002).  Coercion may exist under circumstances such as the following:

> "A plea may be involuntary when an attorney materially misinforms the
> defendant of the consequences of the plea,' *United States v. Rhodes*, 913
> F.2d 839, 843 (10th Cir. 1990), *e.g.* by falsely alleging that promises or
> guarantees exist, *see Braun v. Ward*, 190 F.3d 1181, 1189 (10th Cir. 1999)
> (finding a guilty plea voluntary because the defendant was "taking his
> chances" by relying on his attorney's good-faith advice and there was no
> evidence of guarantees or promises).  In addition, a plea may be involuntary
> if counsel informs the defendant that he has no choice, he must plead guilty.
> *See United States v. Carr*, 80 F.3d 413, 416 (10th Cir. 1996) (stating that, to

be valid, a plea must represent a "voluntary and intelligent *choice* among the alternative courses of action open to the defendant") (emphasis added).

*Fields v. Gibson*, 277 F.3d at 1213.

A guilty plea entered upon the advice of counsel is invalid if the plea was coerced. *Osborn v. Shillinger*, 997 F.2d 1324, 1327 (10th Cir. 1993). That counsel has strongly urged the defendant to plead guilty is not the same as coercion:

> In a prior case, this court found a guilty plea voluntary despite trial counsel's "vigorous[ ] urg[ing]" that his client plead guilty because the attorney believed it was in his client's best interest. *See Miles [v. Dorsey]*, 61 F.3d [1459] at 1470 [(10th Cir. 1995)]. Indeed, one central component of a lawyer's job is to assimilate and synthesize information from numerous sources and then advise clients about what is perceived to be in their best interests. " 'Advice--even strong urging' by counsel does not invalidate a guilty plea." *Williams v. Chrans*, 945 F.2d 926, 933 (7th Cir. 1991) (quoting *Lunz v. Henderson*, 533 F.2d 1322, 1327 (2d Cir. 1976)); *accord Carr*, 80 F.3d at 416.

*Fields v. Gibson*, 277 F.3d at 1214. Many defendants face "financial demands from their counsel," and "courts generally presume that counsel will subordinate his or her pecuniary interests and honor his or her professional responsibility to a client." *United States v. Taylor*, 139 F.3d 924, 932 (D.C. Cir. 1998) (citations and footnote omitted).

If defense counsel's advice was not within the range of competence demanded of attorneys in criminal cases, then the plea was involuntary. *Hill v.*

12

*Lockhart*, 474 U.S. at 56, 106 S. Ct. at 369; *McMann v. Richardson,* 397 U.S.

759, 771 (1970).  The Supreme Court has explained:

> Waiving trial entails the inherent risk that the good-faith evaluations of a
> reasonably competent attorney will turn out to be mistaken either as to the
> facts or as to what a court's judgment might be on given facts.
>
> That a guilty plea must be intelligently made is not a requirement that
> all advice offered by the defendant's lawyer withstand retrospective
> examination in a post-conviction hearing.

*McMann v. Richardson*, 397 U.S. at 770.  , 90 S. Ct. 1441, 25 L. Ed. 2d 763

(1970).

The defendant bears the burden of showing a fair and just reason.

*United States v. Kramer*, 168 F.3d 1196, 1202 (10th Cir. 1999).  If the defendant

meets this burden, then the government "has the opportunity to demonstrate

prejudice."  *United States v. Gould*, 78 F.3d 598, 1996 WL 108497 at *1 (10th Cir.

1996) (Table) (citation omitted); *see United States v. Hickok,*  907 F.2d 983, 986

(10th Cir. 1990) ("Unless a defendant presents a 'fair and just reason' for the

withdrawal, the court need not consider prejudice to the government.") (citation

omitted); *United States v. Rowzer*, 80 F. Supp. 2d 1212, 1217 (D. Kan. 1999),

*aff'd*, 18 Fed. Appx. 702, 2001 WL 991971 (10th Cir. Aug. 30, 2001).  The

standard of "fair and just reason" that first appeared at Rule 32(d) and now appears

at Rule 11(d) serves some important purposes:

> Given the great care with which pleas are taken under this revised Rule 11, there is no reason to view pleas so taken as merely 'tentative,' subject to withdrawal before sentence whenever the government cannot establish prejudice.
>
> Were withdrawal automatic in every case where the defendant decided to alter his tactics and present his theory of the case to the jury, the guilty plea would become a mere gesture, a temporary and meaningless formality reversible at the defendant's whim. In fact, however, a guilty plea is no such trifle, but a "grave and solemn act," which is "accepted only with care and discernment."

*Rowzer*, 80 F. Supp. 2d at 1217 (quoting Fed. R. Crim. P. 32, Advisory

Committee Notes, 1983 Amendment (*quoting United States v. Barker*, 514 F.2d

208, 221 (D.C. Cir.) (*quoting Brady v. United States*, 397 U.S. 742 (1970)), *cert.*

*denied*, 421 U.S. 1013 (1975)); *see United States v. Hyde*, 520 U.S. 670 (1997).

The Supreme Court reiterated in *Hyde* that:

> After the defendant has sworn in open court that he actually committed the crimes, after he has stated that he is pleading guilty because he is guilty, after the court has found a factual basis for the plea, and after the court has explicitly announced that it accepts the plea, [a defendant cannot] withdraw his guilty plea simply on a lark.

*Id.* at 676.

Whether a defendant has carried his burden of demonstrating a fair

and just reason for allowing withdrawal of his guilty plea is a determination based

upon the following factors:

> (1) whether the defendant has asserted his innocence;
> (2) whether withdrawal would prejudice the government;

14

(3) whether the defendant delayed in filing his motion, and if so, the reason
for the delay;
(4) whether withdrawal would substantially inconvenience the court;
(5) whether close assistance of counsel was available to the defendant;
(6) whether the plea was knowing and voluntary; and
(7) whether the withdrawal would waste judicial resources.

*United States v. Sandoval*, 390 F.3d 1294, 1298 (10th Cir. 2004) (quoting *United*

*States v. Rhodes*, 913 F.2d 839, 845 (10th Cir. 1990)).  "A defendant's

dissatisfaction with the length of his sentence generally is insufficient reason to

withdraw a plea."  *United States v. Elias*, 937 F.2d 1514, 1520 (10th Cir. 1991)

(citations omitted).  Nor will a court credit a withdrawal request that is merely a

"delay tactic or an attempt to avoid a harsh sentence."  *United States v. Sandoval*,

390 F.3d at 1298.

## DISCUSSION AND CONCLUSION

### *(1) Assertion of innocence*

Through his written motion and defense counsel's proffer, the

defendant presently claims his innocence and blames his decision to plead guilty

over a decade ago on his attorney's representations about his poor chances of an

acquittal and request for additional fees in the event of trial.  Despite the suspicious

timing of the defendant's current assertions and the serious conflict between this

unsworn assertion and the defendant's contrary sworn statement at the plea

hearing, this court understands that this factor requires little more than a defendant to assert his innocence. *See Carr*, 80 F.3d at 420. The relative weight of this factor, however, is influenced by what the defendant is able to offer in explanation for his latest position. *See United States v. Cervantes*, 115 Fed. Appx. 1, 2004 WL 1798305 (10th Cir. Aug. 12, 2004). The defendant's tendered reasons lack substance and raise more questions than they answer. When placed along side the defendant's sworn statement at the change of plea hearing and the recent testimony from the defendant's former counsel, John Ambrosio, about his standard practices when a client maintains his innocence, the defendant's claim of innocence is no more than an unsupported assertion. This factor favors the defendant but its weight is minimal.

### (2) Prejudice to the government

The defendant does not attempt to argue the absence of prejudice to the government. "Some degree of prejudice to the government is, of course, inevitable from a plea withdrawal." *Carr*, 80 F.3d at 420. Assessing the type, manner and degree of prejudice is necessary to evaluate this factor. *See id.*

In this case, the government contends the withdrawal of the defendant's guilty would prejudice it significantly. The government represents that the co-defendant McKee is available to testify but his cooperation is not guaranteed

16

because he has been threatened by the defendant's relatives for his cooperation in this case.  The original K.B.I. case agent in this case, Larry Dixon, has retired from law enforcement.  The government will have difficulty reopening this case after over a decade and tracking down other witnesses.  Logically and legitimately, the witnesses will be less reliable in recalling events that happened over a decade ago. Allowing the defendant to withdraw his plea would prejudice the government substantially.  This factor weighs heavily against the defendant.

*(3) Delay in filing defendant's motion*

The defendant does not argue his delay of over a decade in filing a motion to withdraw is reasonable or justified under the circumstances.   A court must take into account "'[t]he amount of time which has passed between the plea and the motion.'"  *Rowzer*, 80 F. Supp. 2d at 1219 (quotation and citation omitted).  While "[a] swift change of heart" is strong evidence of the defendant's "haste and confusion," a long delay requires more forceful and substantial reasons for withdrawal.  *Id*.  "[E]xtended delays weigh against granting a withdrawal motion because they often result in substantial prejudice to the government and may suggest manipulation by the defendant."  *Carr*, 80 F.3d at 420.  The Tenth Circuit in *Carr* summarized:

[I]f the defendant has long delayed his withdrawal motion, and has had the

17

full benefit of competent counsel at all times the reasons given to support withdrawal must have considerable . . . force.  The movant's reasons must meet exceptionally high standards where the delay between the plea and the withdrawal motion has substantially prejudiced the Government's ability to prosecute the case.

*Carr*, 80 F.3d at 420 (quoting *United States v. Vidakovich*, 911 F.2d at 439-40 (delay of five months).

When courts have found delays of six weeks and less to be excessive, it is a foregone conclusion that a delay of over a decade is unreasonable.  *See, e.g., United States v. Burk*, 36 F.3d 1106, 1994 WL 526709 (10th Cir.1994) (Table) (defendant's change of heart after six week delay, prompted by his belated assessment that he would receive a harsher sentence, unreasonable), *United States v. Stewart*, 51 F.Supp.2d 1147, 1152 (D. Kan. 1999) (delay of six weeks unreasonable), *aff'd*, 215 F.3d 1338 (10th Cir. 2000).  The defendant offers no explanation for his delay.  As the government argues, the circumstances certainly support a reasonable inference that the defendant absconded upon learning of the severity of his expected sentence.  Thus, the delay here was occasioned by his own displeasure with the anticipated severity of the sentence which is not a "'fair and just reason to withdraw from a guilty plea.'"  *United States v. Cervantes*, 2004 WL 1798305 at *8 (quoting *United States v. Rhodes*, 913 F.2d at 845-46).  As the government legitimately argues, the delay here has substantially prejudiced it, and

18

the court should be exceedingly cautious in allowing the defendant to benefit from the favorable circumstances he created by absconding for over a decade. This factor weighs heavily against the defendant.

*(4) Inconvenience to the court*

"As with the prejudice [to the government factor], some degree of inconvenience is inevitable." *Carr*, 80 F.3d at 420. Considering the court's busy criminal docket and the delay and difficulties uniquely associated with preparing decade-old charges for trial and compelling witnesses' attendance, the court would be inconvenienced by the withdrawal of the plea. This factor weighs against the defendant.

*(5) Assistance of counsel*

The defendant does not directly challenge the effectiveness of his prior counsel's representation, and the record simply affords no basis for questioning the competency of counsel's representation. The government presented the testimony of John Ambrosio, a highly respected defense counsel who has practiced criminal law in Kansas for over thirty years. Mr. Ambrosio explained that his files for this case were destroyed after seven years pursuant to his office policy and candidly admitted that he could not recall much about his representation of the defendant.

Mr. Ambrosio, however, did testify at length with regards to his office policy and standard practices in representing criminal defendants. On the topic of a client who professes innocence, Mr. Ambrosio testified that he would not advise such a client to plead guilty and if the client still wanted to plead guilty then he would make a record at the change of plea hearing to indicate that the plea was being entered against his advice. The transcript from the change of plea hearing shows Mr. Ambrosio made no such record here. On the topic of additional fees for going to trial, his practice is to keep clients abreast of their fee obligations but if a client is unable to pay additional fees then he will work at having the court appoint him. The court record reflects no effort by Mr. Ambrosio to seek appointment. Mr. Ambrosio emphasized that in compliance with his ethical obligations as a defense counsel he was prepared for trial and ready to proceed and would have done so whether or not the defendant paid the additional fees or the court appointed him. On the topic of 5K1.1 provisions in plea agreements, Mr. Ambrosio testified that his practice is not to negotiate for such a term unless the client indicates he has information which would assist the government. Because this was a full discovery case, Mr. Ambrosio relates that the defendant would have been told about those co-conspirators who were cooperating with the government and against him and would have had the importance of 5K1.1 information explained

to him.  Mr. Ambrosio testified that he has his clients read the plea petition and factual basis prior to the change of plea hearing and that he explains their use at the hearing.  With respect to the factual basis here, Mr. Ambrosio impressed upon all that as an officer of the court he would not have said that the government could offer evidence in proof of it unless he believed it and he wouldn't have allowed the defendant to stipulate to the factual basis if the defendant had expressed his innocence.

The government represents that this was a full discovery case and that defense counsel met several times with government counsel to view the complete file.  At the status conference held ten days before the scheduled trial date, defense counsel appeared ready for trial and offered a theory of defense.  On the day that the jury trial was scheduled to begin, the defendant entered his guilty plea and told the court that he was satisfied with his counsel's services.  The defendant does not offer any argument that his counsel erred or was incompetent in advising him of the risks in going to trial or of the benefits in entering a plea.  Nor does the defendant offer any proof of prejudice resulting from the counsel's advice.  *See Hill v. Lockhart*, 474 U.S. 52, 58 (1985) (To show prejudice in the guilty plea context, a defendant must show "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to

21

trial."). The defendant's mere allegation that but for his former counsel's pressure he would have insisted on going to trial is insufficient to establish prejudice. *See United States v. Gordon*, 4 F.3d 1567, 1571 (10th Cir. 1993), *cert. denied*, 510 U.S. 1184 (1994).

"Although constitutionally deficient performance by defense counsel may render a plea involuntary, '[a] miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally deficient performance.'" *United States v. Williams*, 118 F.3d 717, 718 (10th Cir.) (*quoting United States v. Gordon*, 4 F.3d at 1570), *cert. denied*, 522 U.S. 1033 (1997). Counsel's erroneous estimation is insufficient to justify withdrawal of the defendant's guilty plea. *See United States v. Zambrano-Sanchez*, 182 F.3d 934, 1999 WL 339694, at *3 (10th Cir. 1999) (counsel allegedly estimated a sentence of five to six and one-half years and the defendant received 151 months). At the change of plea hearing, the court advised the defendant of the maximum penalty he was facing, of the application of the sentencing guidelines, and of the inability to determine the defendant's sentence until the PSR is prepared and objections thereto are decided. The defendant indicated he understood this information. "[D]issatisfaction with the length of a sentence is an insufficient reason to withdraw a plea." *United States v. Gordon*, 4 F.3d at 1573. Having received the effective and competent assistance of his

counsel throughout the proceedings, this factor weighs against the defendant.

*(6) Voluntariness of the plea*

The defendant fails to come forward with any persuasive evidence challenging the voluntariness of his plea.  The court rejects as not credible the defendant's allegations that he was economically coerced by his counsel into pleading guilty and finds ample reason from the testimony of Mr. Ambrosio to presume he would have subordinated his pecuniary interests and honored his professional responsibility to represent the defendant had the case went to trial. The transcript from the change of plea hearing belies any assertion by the defendant that he was unaware of his rights or how his sentence would be determined.  The government's counsel filed a written factual basis for the plea, and the defendant said he had read it and admitted it was true.  The defendant pleaded guilty to count one and said he knew of no reasons why the court should not accept his guilty plea. Based upon the extended colloquy between the court and the defendant prior to the court's acceptance of his guilty pleas, it is very difficult for the court to imagine that the defendant's plea was anything but the product of a voluntary, knowing and intelligent waiver of his constitutional rights.  *See United States v. Williams*, 118 F.3d at 718.  The defendant's post-plea remorse does not render his plea involuntary.  *See United States v. Jones*, 168 F.3d at 1220 n.1 ("The notion

that a defendant may withdraw his guilty plea because he later feels that he made a poor decision has been flatly rejected by numerous courts"). "'Solemn declarations in open court carry a strong presumption of verity.'" *United States v. Estrada*, 849 F.2d 1304, 1306 (10th Cir. 1988) (quoting *Blackledge v. Allison*, 431 U.S. 63, 74 (1977)). Thus, "[a] defendant's statements at a plea hearing 'should be regarded as conclusive [as to truth and accuracy] in the absence of a believable, valid reason justifying a departure from the apparent truth' of those statements." *Id.* (quoting *Hedman v. United States*, 527 F.2d 20, 22 (10th Cir. 1975)). The defendant offers no credible or valid reason for questioning the truthfulness of his earlier representations under oath. This factor weighs against the defendant.

*(7) Waste of judicial resources*

"[S]ome waste of judicial resources from a plea withdrawal is inevitable." *Carr*, 80 F.3d at 421. Besides the time and effort expended in this and prior proceedings that would have to be repeated, a presentence report has already been prepared and disclosed to the parties. Though the waste here is not overwhelming, this factor still weighs against the defendant.

Having weighed the evidence presented and then applied it to the factors relevant under Tenth Circuit precedent, the court concludes that the defendant has failed to demonstrate a fair and just reason for withdrawing his plea.

24

The court further finds that the defendant's plea was the product of his knowing, intelligent and voluntary waiver of his constitutional rights.  The court denies the defendant's motion to withdraw his plea of guilty.

**UNRESOLVED OBJECTIONS TO PSR**

The addendum to the PSR groups the defendant's unresolved objections into three.  The first group concern the PSR's finding that the laboratory found at the defendant's residence would produce nearly 80 kilograms of amphetamine.  The defendant summarily objects to the PSR's recommended finding but specifically argues any finding must not violate his constitutional rights as delineated in the recent Supreme Court decision of *Blakely v. Washington*, 542 U.S. ___, 124 S. Ct. 2531 (2004).  The defendant's second objection reasserts his constitutional rights argument with regards to the obstruction of justice adjustment. The defendant's last objection is that his base offense level may not exceed the "statutory maximum" as that term has been construed recently by the Supreme Court.

The defendant lodged his objections prior to the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738, 2005 WL 50108 (Jan. 12, 2005), in which the Court first held that the principles enunciated in *Blakely* applied to the United States Sentencing Guidelines ("guidelines") such that their mandatory

enforcement was unconstitutional because the guidelines did not meet the Sixth

Amendment requirements.  The Court preserved the guideline sentencing scheme

by severing those provisions of the Sentencing Reform Act that made the

guidelines mandatory, and consequently, the guidelines are now "effectively

advisory," 125 S. Ct. at 757, and the standard of appellate review is no longer *de*

*novo* but reasonableness.  As modified, the Act now "requires a sentencing court

to consider Guidelines ranges, *see* 18 U.S.C.A. § 3553(a)(4) (Supp. 2004),  but it

permits the court to tailor the sentence in light of other statutory concerns as well,

*see* 3553(a) (Supp. 2004)."  *Id*.  Put another way, sentencing courts, "while not

bound to apply the Guidelines, must consult those Guidelines and take them into

account when sentencing.  *See* 18 U.S.C.A. §§ 3553(a)(4), (5) (Supp.2004)."  *Id*. at

767.

Following *Booker's* remedial scheme, this court will follow the same

procedures already employed under the guidelines of first resolving all disputes

about the application of the guidelines in compliance with Fed. R. Crim. P.  32(i)

and determining the advisory guideline range.  By the terms of 18 U.S.C. §

3553(a), the court then must arrive at and "impose a sentence sufficient, but not

greater than necessary, to comply with the purposes of sentencing set forth" here:

(2) the need for the sentence imposed–

26

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).  In doing so, the court is called upon by statute to consider these other relevant factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
. . . .
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for--
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . . ;
(5) any pertinent policy statement . . . [issued by the Sentencing Commission];
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).  Thus, § 3553(a) instructs a sentencing court to consider the established guideline sentencing range, listed as (4), as simply one of the statutory factors relevant in arriving at a sufficient sentence.  *See United States v. Oliver*, ___F.3d___, No. 03-2126, slip op. at p. 9 (6th Cir. Feb. 2, 2005); *United States v. Hughes*, 2005 WL 147059, at *8 (4th Cir. Jan. 24, 2005).  By the terms of § 3553(c), the court remains obligated to state its reasons for imposing any sentence

outside the applicable guideline range.

The defendant is not in a position to advance any of his objections grounded on *Blakely*. Concerning the calculated amount of drugs, the defendant in his change of plea hearing on October 17, 1994, admitted or stipulated to this amount of amphetamine. (Dk. 110, pp. 11-12). The obstruction of justice enhancement is based on the defendant's failure to appear at sentencing to which the defendant pleaded guilty as charged in case no. 95-40050. As the Supreme Court in both *Blakely* and *Booker* noted, Sixth Amendment rights are not implicated when a judge sentences based on facts admitted by the defendant. *Booker*, 125 S. Ct. at 755; *Blakely*, 124 S. Ct. at 2537. Moreover, as part of this plea agreement in case no. 95-40050, the defendant waived any rights under *Blakely* and agreed that the facts determining his offense level would be found by the court using a preponderance of evidence standard.

In a recent sentencing memorandum, the defendant argues that his prior admissions at the change of plea hearings do not function as a waiver of his constitutional right to have findings that would result in an increased sentence determined by the standard of beyond a reasonable doubt. In effect, the defendant asks the court to ignore the language found in both *Blakely* and *Booker* as inconsistent with Supreme Court precedent on waiver of constitutional rights. As it

28

is not within the province of this court to question the consistency of current

Supreme Court decisions and to rewrite them accordingly, the court will apply the

Supreme Court decisions of *Booker* and *Blakely* as written.  Nor has the defendant

come forward with any persuasive reasons for narrowly reading *Booker* and

*Blakely* in this regard.  For that matter, the defendant's sentencing memorandum is

not convincing in its argument that a court must now use a higher standard of proof

whenever finding or applying one of the sentencing factors under § 3553(a), which

is logically all that the court will be doing when it consults the guidelines as

advisory.

Thus, the court finds that amount of drugs and the obstruction of

justice enhancement applied in the PSR are supported by persuasive evidence in the

form of the defendant's own sworn admissions.  The defendant's objections to the

PSR are overruled.

IT IS THEREFORE ORDERED that the defendant's motion to

withdraw his plea of guilty (Dk. 111) is denied;

IT IS FURTHER ORDERED that the defendant's unresolved

objections appearing in the PSR's addendum and/or the defendant's sentencing

memorandum (Dk. 112) are overruled.

Dated this 10th day of February, 2004, Topeka, Kansas.

s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge